Filed 8/27/25  In re A.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E085289 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J257642, J257643) |
| v. | OPINION |
| L.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant, L.G.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant, C.G.

1

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendants and appellants, L.G. (Grandmother) and C.G. (Grandfather) appeal the juvenile court's orders removing their Grandchildren, Al.J. (born in 2014) and An.J. (born in 2011), from their care, denying the Grandparents reunification services, and terminating their legal guardianship of the Grandchildren.  We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The Grandchildren were placed in the Grandparents' care in 2016 after they were removed from their mother's care during a dependency case.  The juvenile court later appointed the Grandparents to be the Grandchildren's legal guardians and terminated the dependency case.

This case stems from an incident in 2024, when Al.J. was 10 and An.J. was 13, and the resulting investigation by plaintiff and respondent, the San Bernardino County Children and Family Services (CFS).

CFS received a referral in May 2024 that, during a relative's gender reveal party, Grandmother yelled at An.J., pulled her hair, threw her to the ground, and punched and kicked her.  An.J. suffered bruising on her face, redness on the back of her head,

2

migraines, and leg pain. The referral also alleged that the maternal aunt, T.B., participated in the abuse.

When CFS investigated the referral, the social worker spoke with a police officer, who said Grandmother and the maternal aunt had been arrested for their assault on An.J. The officer also reported that An.J. said that her maternal uncle, N.D., had molested her.

The social worker spoke with An.J., who confirmed the abuse. She explained that she was yelling at Grandmother at the gender reveal party when the maternal aunt began pulling An.J.'s hair and hitting her in the face, causing her to fall. Grandmother then began hitting her. The social worker observed that An.J. had scratches, redness, and bruising on her face.

An.J. also told the social worker that Grandmother had consistently punched and slapped her as a form of discipline. An.J. feared living in the Grandparents' home. Although Grandfather did not physically abuse An.J., he was aware of Grandmother's abuse and did nothing about it.

An.J. told the social worker about her uncle's sexual abuse as well. She explained that the uncle periodically lives at the Grandparents' home and had inappropriately placed his hand on her thigh and touched her vagina. In a later investigation, An.J. reported that the uncle had grabbed her breasts. She also said that the uncle had molested her when she was eight or nine and, a few years later, he put his hand underneath her bra strap when hugging her.

When An.J. reported the abuse to Grandmother, Grandmother did not believe her, called her "sick in the head," and said that she was on drugs. An.J. further claimed that Grandmother coached her against disclosing the uncle's sexual abuse to other people.

The social worker spoke with the Grandparents and the maternal aunt, all of whom denied any abuse or corporal punishment to An.J. in the home. Instead, they all claimed An.J. was drinking and/or on drugs and had been giving the family "problems" for months by being combative, physically aggressive, and argumentative, and acting erratically.

Grandmother admitted, however, that during the reported incident in question, she had to physically restrain An.J., and the maternal aunt slapped her in the face twice. Grandmother also said An.J. told her that the uncle had pinched her "on the ass," and claimed that he frequently pinches and tickles people.

When the social worker spoke to Al.J., she said she had not been there when the incident in question occurred. She also denied seeing injuries on An.J., that there was any kind of corporal abuse or discipline in the house, or that Grandmother had coached her or An.J.

Later, however, Al.J. contacted the social worker and said she had not been truthful. She explained that the Grandmother had told her what to say to the social worker because Grandmother was afraid of being arrested. Al.J. reported that she saw the physical fight between Grandmother, the maternal aunt, and An.J. under investigation. According to Al.J., the maternal aunt slapped An.J. in the face three times, dragged her by

her hair onto the floor, and then the aunt and Grandmother got on top of An.J. and began hitting her. Al.J. and her boyfriend had to pull the aunt and Grandmother off of An.J. The next day, Al.J. noticed bruising on An.J.'s face and clavicle area.

Al.J. told the social worker that Grandmother hits An.J. "often," including by slapping her in the face. Al.J. also stated that Grandmother spanked An.J. multiple times, one time so hard that it caused bruising to her leg. In Al.J.'s view, Grandmother disciplined the children by being mean, grabbing their arms, and "whoop[ing] their ass[es]." Al.J. later reported that Grandmother hit her and An.J. with a spatula, a hanger, and a broomstick, which left them both with red marks. Grandmother also called An.J. "fat" and said that she "looks like a slut."

Al.J. likewise reported that the maternal uncle had inappropriately touched her multiple times, including by kissing her on the cheek, pulling her feet toward him, and throwing her on the bed and tickling her. Al.J. later reported that she had seen the maternal uncle touch An.J.'s "butt or boobs." Al.J. told Grandmother that the maternal uncle makes her uncomfortable, but Grandmother did nothing. Al.J. also disclosed that her adult sibling, M.V., told her that the maternal uncle had inappropriately "smacked [M.V.] on the buttocks," and touched her vagina. When M.V. reported these incidents to Grandmother, Grandmother either said M.V. was lying or said the maternal uncle would no longer be allowed in the house.

In response to the children's disclosures, CFS detained them and filed supplemental petitions under Welfare and Institutions Code section[1] 387, alleging that the children had suffered, or were at risk of suffering, physical and sexual abuse in the Grandparents' home.

During CFS's subsequent investigation, the Children's Assessment Center (CAC) performed a forensic interview and medical examination of the children. Both girls reported to CAC that they suffered physical abuse from Grandmother, and An.J. reported the uncle's sexual abuse. The CAC report concluded that Al.J. had a physical mark on her that was consistent with the abuse she disclosed. An.J. likewise presented with multiple marks that were consistent with her disclosures of physical abuse. Consistent with their statements to CFS, the children told CAC that Grandmother had coached them not to disclose any abuse, including their uncle's sexual abuse.

Based on this report and CFS's further investigation, CFS recommended that the juvenile court no longer offer services to the Grandparents. CFS instead recommended that only the children's mother (who is not a party to this appeal) should receive reunification services. The court set the matter for a contested dispositional hearing.

Both girls testified at the hearing. Their testimony was consistent with their prior statements to CFS. They reported repeated physical abuse by their Grandmother, which included her punching and slapping them, and hitting them with objects. They both

---

[1] Unless otherwise noted, all further statutory references are to the Welfare and Institutions Code.

6

recounted the incident at the gender reveal party, where Grandmother and the maternal aunt assaulted An.J., which left her with pain and marks for weeks. An.J. recounted the uncle's sexual abuse and that she reported it to Grandmother, but neither she nor Grandfather did anything about it. Nor did Grandfather do anything about Grandmother's abuse, despite being aware of it.

Grandmother and the maternal aunt also testified at the hearing. The juvenile court found their testimony inconsistent and thought Grandmother was being evasive when answering questions. By contrast, the juvenile court found An.J. and Al.J. to be credible, particularly because their testimony was consistent at the hearing and consistent with their prior statements.

The court therefore found the section 387 petition's allegations true and granted the petition. The court then found that it was not in the children's best interests to offer reunification services to the Grandparents and ordered the children removed from the Grandparents' care. As the hearing concluded, CFS made an oral motion to terminate the Grandparents' guardianship of the Grandchildren, which the juvenile court granted. The Grandparents timely appealed.

## III.

## DISCUSSION

The Grandparents' first argument is that the juvenile court erroneously declined to order reunification services for them. We find no error.

7

Because the Grandparents were only the Grandchildren's guardians appointed by the juvenile court, they were not entitled to reunification services after the juvenile court granted the section 387 petition and removed the Grandchildren from their care. (*Dora V. v. Superior Court* (2024) 104 Cal.App.5th 987, 1001-1004 (*Dora V.*).) Under these circumstances, the juvenile court had discretion to order reunification services to the Grandparents only if the court found it was in the Grandchildren's best interests. (*Id*. at p. 1006; *In re Z.C.* (2009) 178 Cal.App.4th 1271, 1281.) We therefore review the juvenile court's decision not to order reunification services for the Grandparents for an abuse of discretion. (*Dora V.*, *supra*, at p. 1001.)

No abuse of discretion occurred here. The Grandchildren consistently testified that Grandmother routinely physically abused them. At the gender reveal party, Grandmother slapped and hit An.J. in the face, pulled her to the ground by her hair, and punched her in the face multiple times while on top of her. The maternal aunt participated in this attack as well, yet the Grandfather did nothing after learning about it. On multiple prior occasions, Grandmother slapped the girls, hit them with objects, and threw things at them. The maternal uncle sexually abused and molested both girls, and when they reported it to Grandmother, she either said they were lying or told them not to disclose it to anyone. Grandmother was, at best, indifferent about the uncle's sexual abuse. At worst, she was complicit in it, given that she consistently pressured the girls not to tell anyone about the uncle's abuse. She also pressured them not to disclose her abuse.

Given all of this, the juvenile court did not abuse its "broad discretion" in finding that ordering reunification services for the Grandparents was not in the Grandchildren's best interests. (*Dora V.*, *supra*, 104 Cal.App.5th at p. 1011.) The juvenile court properly considered the risks to the Grandchildren posed by the Grandparents' behavior, particularly Grandmother's repeated physical abuse, and their lack of protective capacity, particularly considering the uncle's repeated sexual abuse of both girls. (See *ibid.* [courts should consider the "guardian's fitness and history" when deciding if reunification services are in the child's best interests].)

The Grandparents nonetheless contend the juvenile court erred in ordering reunification services for them because the only alternative was placing the Grandchildren in foster care. They claim the juvenile court had to consider whether reunification services could "salvage" the Grandparents' guardianship and "rehabilitate" their home, thereby preventing the Grandchildren from being placed in foster care. In support, they rely heavily on *In re Jessica C.* (2007) 151 Cal.App.4th 474.

But *Jessica C.* held only that the juvenile court must "at least *consider* whether services are available to ameliorate the need" for modifying the guardianship. (*In re Jessica C.*, *supra*, 151 Cal.App.4th at p. 484.) The juvenile court in that case simply terminated the child's guardianship without considering "whether the problems leading to the petition [to terminate the guardianship] . . . could be addressed with services." (*Id.* at p. 483.) This was in large part because the social services agency in *Jessica C.* made no assessment as to what services were available, whether they could potentially save the

9

guardianship, and whether doing so was in the child's best interests. (*Id*. at p. 484.) As a result, the juvenile court did not even consider whether to order services to the guardian before terminating the guardianship. (*Ibid*.)

That did not occur here. Whether to order the Grandparents' reunification services was the focal point of the hearing during which the Grandparents' guardianship was terminated. CFS recommended against them, the Grandparents' counsel asked for them, and the juvenile court expressly considered whether to order them, but ultimately decided they were not in the children's best interests.

The Grandparents next argue that the juvenile court erred by granting CFS's oral motion to terminate their guardianship. They rightly claim, and CFS correctly concedes, that the court could terminate the guardianship only by way of a section 388 petition. (See *Dora V.*, *supra*, 104 Cal.App.5th at p. 1004; *In re Z.C.*, *supra*, 178 Cal.App.4th at p. 1277.) We thus agree with the parties that the juvenile court erred in granting CFS's oral motion to terminate the guardianship. The error, however, was harmless. (See *B.B. v. Superior Court* (2016) 6 Cal.App.5th 563, 572.)

On this record, we have little trouble concluding that the Grandparents would not have achieved a better result had the juvenile court followed the section 388 petition procedures. (*B.B. v. Superior Court*, *supra*, 6 Cal.App.5th at p. 572.) Even under that procedure, "To receive reunification services, [the Grandparents] would have had to 'prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child.' [Citations.]" (*Ibid*.; see also *Dora V.*, *supra*, 104

10

Cal.App.5th at p. 1005 ["[A]fter the juvenile court establishes a legal guardianship, the guardianship may be terminated pursuant to a section 388 petition and hearing, based on the best interests of the child."].)  As explained above, the juvenile court necessarily found that ordering reunification services was not in the children's best interests.  There is no reasonable probability that the juvenile court would have found otherwise had CFS filed a section 388 petition to terminate the Grandparents' guardianship instead of making an oral motion to do so.  (*Dora V.*, *supra*, at p. 1005.)  The juvenile court's error in granting that oral motion was thus harmless.

IV.

DISPOSITION

The juvenile court's orders denying the Grandparents reunification services and terminating their guardianship over the Grandchildren are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

FIELDS
               J.

RAPHAEL
               J.

11